1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10 | PINNACLE PROCESSING GROUP, INC.,

| CASE NO. C10-1126-RSM

11

Plaintiff,

| ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

12

v.

13

14 | HARTFORD CASUALTY INSURANCE COMPANY, a foreign insurer,

15

Defendant.

16

17

# I. INTRODUCTION

18      This matter comes before the Court upon Defendant's Motion for Summary Judgment

19 (Dkt. # 22); Plaintiff's Motion for Partial Summary Judgment (Dkt. # 37); and Defendant's

20 Motion for Protective Order (Dkt. # 20).   For the reasons set forth below, Defendant's Motion is

21 GRANTED, Plaintiff's Motion is DENIED, and the Motion for Protective Order is DENIED.

22

23

24

1                                     **II. BACKGROUND**

2 **A.  Credit Card Processing, Generally**

3         Plaintiff Pinnacle Processing Group, Inc. ("PPG") is a Washington corporation whose

4 primary business is to process credit card transactions for merchants.  PPG is an Independent

5 Sales Organization ("ISO") as that term is understood in the credit card industry and it contracts

6 with a "merchant bank" called Merrick Bank.  Pursuant to PPG's ISO Agreement with Merrick

7 Bank, PPG is responsible for marketing credit card processing services to merchants and

8 assisting them in obtaining the equipment and software necessary to access those services.  Thus,

9 PPG utilizes independent sales agents to enter into agreements with individual merchants who

10 wish to offer their customers the ability to pay for goods and services with bank cards.  Upon

11 entering into an agreement with PPG, the merchant is sold or leased a credit card terminal

12 through which its customers may swipe credit cards to make purchases.

13         Once a merchant has entered into an agreement with PPG and set up its credit card

14 terminal, its customers may use credit cards to pay for goods and services at their place of

15 business.  When a customer swipes a credit card at the merchant's credit card terminal, data

16 passes through the terminal to the bank that issued the credit card – the "issuing bank."  The

17 issuing bank returns an electronic message indicating whether there are sufficient funds or there

18 is sufficient available credit to cover the cost of the transaction.  If there is money available on

19 the card, the transaction is approved, and the merchant's sale to the customer is consummated.

20         At the end of each day, the merchant's account is settled: Merrick Bank deposits funds

21 into the merchant's bank account in an amount equal to the sum of all of the credit card

22 transactions processed in that day.  Merrick Bank, in turn, is reimbursed by the banks that issue

23

24

1  the credit cards.  The banks that issue the cards pay Merrick Bank by debiting their customers'

2  accounts.

3          In certain situations, money must be refunded from the merchant to the customer.  When

4  this happens, the transaction is reversed in what is termed a "chargeback."  A chargeback can

5  occur when a customer returns an item to the merchant, when there is an error in the transaction

6  or in processing the transaction, or as a result of fraud.  When a chargeback occurs, funds are

7  either returned to the customer's issuing bank or the charged amount is never posted against the

8  customer's account at the issuing bank.  The merchant must then enable the same amount of

9  funds to be debited from its account.  If there is a chargeback and the merchant cannot cover the

10  amount of the refund, or has disappeared, one of the processing entities will generally end up

11  covering the loss.  In this case, the entity that bears the risk in the case of chargeback losses is

12  PPG.

13          Pursuant to PPG's ISO Agreement with Merrick Bank, PPG is required to establish a

14  $250,000 "reserve account" (the "ISO Reserve Account") with Merrick Bank as security for the

15  satisfaction of chargeback credits that do not get reimbursed by merchants. Dkt. No. 39, ¶7.7.

16  Merrick Bank is the sole and exclusive owner of the ISO Reserve Account and is authorized to

17  withdraw amounts from the account to cover its losses incurred through unreimbursed

18  chargebacks:

19          Merrick may withdraw from the ISO Reserve Account from time to time amounts
            equal to any losses suffered or incurred by Merrick, or reasonably expected by
20          Merrick to be suffered or incurred, in connection with (i) Merchant chargebacks,
            other Merchant acts, omissions, activity or fines, charges or other assessments
21          made by any Association based upon any Merchant activity… (ii) any other
            amount payable by ISO to Merrick pursuant to the terms of this Agreement, and
22          (iii) ISO's acts, omissions or activity, or finds, charges or other assessments made
            by any Association based on ISO activity.

23

24

1  *Id.* When Merrick withdraws from the reserve account, PPG is required to replenish those funds

2  within two days.  *Id.*

3  **B.  The Fraud Alleged in this Case**

4          In 2008 and 2009, PPG sustained chargeback losses in the sum of $360,823.56 as a result

5  of fraudulent credit card transactions processed through PPG's computer system by several retail

6  merchants with whom PPG had established business relationships.  One of those merchants was

7  Kirakosyan Jewelers.  Kirakosyan Jewelers requested merchant services from PPG for the

8  purpose of selling watches, jewelry and accessories for an average price of $500 and an

9  estimated monthly credit card volume in the amount of $50,000.  PPG accepted and activated

10  Kirakosyan's merchant account in September 2008.

11          Kirakosyan Jewelers processed credit card transactions within the contracted limits until

12  December 2008.  Between December 8 and December 17, 2008, however, it processed $228,000

13  worth of credit card transactions.  PPG's staff verified each of these transactions by having

14  telephone conversations with the merchant, the customers, and sometimes with the issuing bank.

15  Each of the transactions was processed after the legitimacy and capacity of the cardholder

16  customer was established.  Nonetheless, on January 6, 2009, Kirakosyan Jewelers ran 23

17  requests for refunds for a total amount of $228,044.  PPG attempted to freeze the refund

18  requests, but was ultimately obligated to process them when the cardholders submitted written

19  requests to the issuing banks for the refunds.[1]  When PPG attempted to electronically recover

20  these refund credits from the Kirakosyan bank account, they were dishonored.  As a result,

21  Merrick deducted $228,044 from PPG's reserve account to cover the cost of refunding the

22  issuing banks that had extended refunds to their customers.  PPG replaced the funds in the

23  ─────────────────

24  [1] It is believed that the customers in this case were working together with Kirakosyan Jewelers to
    perpetuate the fraud.  Dkt. # 23-1, p. 39.

reserve account within two days pursuant to its contractual obligations.  The additional

approximately $132,000 in losses were incurred by other merchants in a substantially similar

manner.

**C. The Insurance Policy**

PPG is covered by a policy of insurance that it purchased from Defendant Hartford

Casualty Insurance ("Hartford").  The policy was effective for the policy period 7/29/08 –

7/12/09, and consisted of the "Spectrum Policy Declarations," the "Special Property Coverage

Form," and a "Financial Services Stretch" endorsement.

The Special Property Coverage Form provides:

> **Additional Coverages** …**Money and Securities**… We will pay for loss of
> "money" and "securities" used in your business while at a bank or savings
> institution, within your living quarters of the living quarters of your partners or
> any employee having use and custody of the property, at the "scheduled
> premises", or in transit between any of these places, resulting directly from: (a)
> "Theft"; (b) Disappearance; or (c) Destruction.
> …
> The most we will pay for loss in any one occurrence is: (a) The limit shown in the
> Declarations…

Dkt. No. 23-4, p. 12-13.  The Spectrum Policy Declarations provide "NO COVERAGE" for

Money and Securities.  Therefore, PPG is not covered for a loss of "money" or "securities"

under the Special Property Coverage Form.

PPG, however, purchased additional insurance for computer fraud.  Pursuant to the

Financial Services Stretch Endorsement:

> **Computer Fraud** The following Additional Coverage is added: We will pay up
> to $5,000 in any one occurrence for physical loss of or physical damage to
> "money", "securities", and other property having intrinsic value resulting directly
> from computer fraud. Computer fraud means any act of stealing property
> following and directly related to the use of any computer to fraudulently cause a
> transfer of that property from inside your premises or from a banking institution
> or similar safe depository, to a person (other than a "messenger") outside those
> premises or to a place outside those premises.

1   *Id.* at 33.

2        Other relevant provisions of PPG's insurance policy are as follows:

3        **EXCLUSIONS**…We will not pay for physical loss or physical damage caused by
         or resulting from:… **Dishonesty:** Dishonest or criminal acts by you … or anyone
4        to whom you entrust the property for any purpose.  **False Pretense:** Voluntarily
         parting with any property by you or anyone else to whom you have entrusted the
5        property if induced to do so by any fraudulent scheme, trick, device or false
         pretense.

6   *Id.* at 22-23.

7        **PROPERTY DEFINITIONS …** "Money" means: a. Currency, coins and bank
         notes whether or not in current use… "Securities" means negotiable and
8        nonnegotiable instruments or contracts representing either "money" or other
         property and includes: a. Tokens, tickets except Lottery Tickets, revenue and
9        other non-postage stamps whether or not in current use; and b. Evidence of debt
         issued in connection with credit or charge cards, which are not of your own issue;
10       but does not include "money."

11  *Id.* at 24-25.

12       In late 2009, PPG submitted claims under the Computer Fraud endorsement to Hartford

13  for the losses caused by the fraudulent credit card transactions.  Hartford reviewed and denied

14  the claims.  This lawsuit ensued.

15       In its motion for summary judgment, Hartford argues that PPG's losses did not result

16  from computer fraud because they are not directly related to the use of a computer; that PPG's

17  claim is an "economic loss" not covered by the policy; and that the exclusions for dishonesty and

18  false pretense bar coverage.  *See generally* Dkt. No. 22.  Even if there were coverage, Hartford

19  argues that the PPG's claim is limited to $5,000 per occurrence and subject to a $250 deductible

20  and is limited or barred by the two-year contractual limitation for bringing suit.  *Id.*

21       PPG argues in its motion for partial summary judgment that PPG's losses were in fact

22  directly related to use of a computer.  PPG directs the Court to the definition of "Securities" in

23  the Hartford insurance policy as including "evidences of debt issued in connection with credit or

24

1  charge cards, which are not of your own issue."  Dkt. No. 37, p. 11, citing Dkt. No. 39, p. 25.

2  Under PPG's analysis, the "losses suffered by PPG resulted from fraudulent acts which followed

3  and were directly related to the use of a computer because a request for a fraudulent electronic

4  refund credit is clearly evidence of debt."  Dkt. No. 37, p. 12.  PPG also contends that ambiguity

5  in the policy requires that the Court construe the terms in its favor.  Finally, PPG argues that it

6  does not have to suffer a loss of its own funds in order to secure coverage for computer fraud for

7  the manner in which it sustained the losses.  *Id.* at 13.

### III. DISCUSSION

**A. Standard**

10       Summary judgment is appropriate where "the movant shows that there is no genuine

11  issue as to any material fact and that the movant is entitled to judgment as a matter of law."

12  FRCP 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   In ruling on summary

13  judgment, a court does not weigh evidence to determine the truth of the matter, but "only

14  determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d 547, 549

15  (9th Cir. 1994) (*citing O'Melveny & Meyers*, 969 F.2d at 747).  Material facts are those which

16  might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

17       The Court must draw all reasonable inferences in favor of the non-moving party.  *See*

18  *F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992), rev'd on other grounds, 512

19  U.S. 79 (1994).  However, the nonmoving party must make a "sufficient showing on an essential

20  element of her case with respect to which she has the burden of proof" to survive summary

21  judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Further, "[t]he mere existence of

22  a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

23  evidence on which the jury could reasonably find for the plaintiff."  *Id.*

24

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 7

1    Where policy language is clear and unambiguous, Washington courts enforce the

2    provisions written "and do not modify the policy or create ambiguity where none exists." *Pub.*

3    *Util. Dist. No. 1 v. Int'l Ins. Co.*, 124 Wash.2d 789, 797 (1994).  Ambiguity exists if the policy is

4    susceptible to more than one reasonable interpretation, *Transcon. Ins. Co. v. Wash. Pub. Util.*

5    *Dists'. Util. Sys.*, 111 Wash.2d 452, 456-57 (1988), and any ambiguity is interpreted in favor of

6    the insured, Sears *v. Grange Ins. Ass'n*, 111 Wash.2d 636, 638 (1988).  Finally, definitions set

7    forth in an insurance policy must be applied and undefined terms are given "their plain, ordinary,

8    and popular meaning, as defined in standard English dictionaries." *Overton v. Consolidated Ins.*

9    *Co.*, 145 Wash.2d 417, 427-428 (2002).

10   **B.  Analysis**

11       1.  <u>Cross Motions for Summary Judgment</u>

12       Both parties seek a judicial determination of whether coverage for PPG's losses exist

13   under PPG's insurance policy with Hartford.  The parties do not dispute that, if PPG's losses are

14   covered, they are covered under the Computer Fraud clause of the Financial Services Stretch

15   endorsement.  The Computer Fraud clause provides coverage for "physical loss of or physical

16   damage to 'money', 'securities', and other property having intrinsic value resulting <u>directly</u> from

17   computer fraud."  Dkt. No. 23-4, p. 33.  "Computer fraud" is defined as "any act of stealing

18   property following and directly related to the use of any computer to fraudulently cause a

19   transfer of that property from inside your premises or from a banking institution or similar safe

20   depository, to a person (other than a "messenger") outside those premises or to a place outside

21   those premises."  *Id.*

22       "Direct means without any intervening agency or step: without any intruding or diverting

23   factor." *Moeller v. Farmers Ins. Co. of Washington*, 155 Wash.App. 133, 143 (2010) (citing

24   Webster's Third New Int'l Dictionary 640 (1976)). "Commentators generally agree with this

1  definition." *Id.* (citing 11 Lee R. Russ, Couch on Insurance, § 156:21 (3d ed. 1998) (Supp.

2  2009)).  Here, PPG's loss was not direct.  PPG did not suffer a loss until (1) Merrick Bank was

3  unable to recover the chargeback funds from the merchant banks; (2) Merrick Bank deducted

4  funds from PPG's Reserve Account; and, finally, (3) PPG fulfilled its contractual obligation to

5  replace those deducted funds.  To interpret the term "directly" as potentially applying to such an

6  attenuated chain of events would be to "create ambiguity where none exists." *Pub. Util. Dist.*

7  *No. 1,124 Wash.2d* at 797.  Moreover, such an interpretation would render the use of the word

8  "directly" in the insurance policy superfluous: there would be no difference between the phrase

9  "resulting from computer fraud," and "resulting directly from computer fraud."  Accordingly, the

10  Court gives the term "direct" is plain meaning and, in so doing, determines as a matter of law

11  that that PPG's losses are not covered under the policy.

12          Indeed, several courts that have examined this issue have determined that where a loss

13  must "directly" result from a specified occurrence, the insured's obligation to reimburse a third

14  party for losses that result from that specified occurrence, does not give rise to coverage.  In

15  *Lynch Properties, Inc. v. Potomac insurance Company of Illinois,* a corporation's employee

16  embezzled money from one of its clients.  962 F.Supp. 956, 959 (N.D. Tex. 1996), *aff'd,* 140

17  F.3d 622 (5th Cir. 1998).  The corporation transferred its own funds to cover its client's loss and

18  then filed a claim with its insurance company.  *Id.* The corporation's insurance policy provided

19  "[w]e will pay for loss of ...Covered Property resulting directly from the Covered Cause of

20  Loss." *Id.* at 961.  "Covered Cause of Loss" was defined as "employee dishonesty." *Id.* The

21  Court held that the words "resulting directly from" unambiguously limited coverage to the

22  insured's direct losses and adopted the insurance company's interpretation that "[s]ince the direct

23  result of [the employee's] embezzlement was a loss to [the client's] personal funds, and the

24

indirect result was Lynch's replacement of those lost funds… [the corporation] cannot recover under the policy." *Id.* at 962-63.  The same analysis is appropriate here: since the direct result of the purported computer fraud was a loss to Merrick Bank, and the indirect result was PPG's replacement of those lost funds, PPG cannot recover under the policy.

Several other courts interpreting similar contract language have reached the same result. *See Vons Companies, Inc. v. Federal Ins. Co.,* 212 F.3d 489, 492-93 (9th Cir. 2000) ("We hold that 'direct' means 'direct' and that in the absence of a third party claims clause, Vons's policy did not provide indemnity for vicarious liability for tortious acts of its employees."); *Methodist Health System Foundation, Inc. v. Hartford Fire Ins. Co.* , 2011 WL 2607107, at *3 ( E.D. La. July 1, 2011) (also relying on *Lynch* and interpreting identical computer fraud provision as that at issue here as precluding coverage because "only Tremont suffered losses 'resulting directly from' the Madoff ponzi scheme; Plaintiff was too far removed from the Madoff scheme in order to recover under a 'direct loss' provision because Plaintiff invested in Meridian, who invested in Tremont.."); *Finkel v. St. Paul Fire and Marine Ins. Co.*, 2002 WL 1359672, 5 (D. Conn. 2002) ("That the insured may be liable to a third party for a loss of money resulting from employee dishonesty does not transform a policy covering the insured against a direct loss into one indemnifying against liability.") (internal citation omitted).

PPG argues that it suffered a loss – in that it incurred a debt – as soon as the fraudulent requests for refunds were issued.  The computer fraud provision covers physical losses of both "money" and "securities."  Dkt. No. 23-4, p. 33.   The definition of "securities" includes "[e]vidence of debt issued in connection with credit or charge cards, which are not of your own issue."  Thus, argues PPG, "the losses suffered by [PPG] resulted from fraudulent acts which followed and were directly related to the use of a computer because a request for a fraudulent

1   electronic refund credit is clearly evidence of debt." Dkt. # 37.  The Court is not persuaded by

2   this argument.  The computer fraud provision by its express terms covers the physical *loss* of

3   securities, or, "evidence of debt."  To construe the provision as simultaneously covering any *gain*

4   of a debt to another – which is essentially what PPG argues – would be to read the terms of the

5   policy as providing coverage for exactly the opposite of that which it purports to cover.

6          Rather, PPG's loss resulted directly from its contractual obligation to cover any

7   chargeback losses incurred by Merrick Bank, not from computer fraud.  PPG's loss was only

8   indirectly caused by the purported computer fraud.  There is no coverage for PPG under the

9   computer fraud provision of its insurance contract with Merrick.  Because the Court has

10  determined that there is no coverage for PPG as a matter of law, it declines to address the other

11  bases for denial of coverage in this order.  Hartford's motion for summary judgment is

12  GRANTED and PPG's motion for partial summary judgment is DENIED.

13      2.  Motion to Strike

14         In its reply to PPG's motion for summary judgment, Hartford moves to strike from the

15  Declaration of Eric Zubel "the testimonial references and the attached exhibit 1 pertaining to

16  Hartford Casualty's alleged internet advertising."  Dkt. # 34, pp. 8-9.  Because the Court did not

17  rely on these materials in rendering its decision on the parties' cross motions for summary

18  judgment, the motion is MOOT.

19      3.  Motion for Protective Order

20         Hartford moves for a protective order under Fed. R. Civ. P. 26(c)(1) regarding a 30(b)(6)

21  deposition notice issued by PPG.  A motion for a protective order "must include a certification

22  that the movant has in good faith conferred or attempted to confer with other affected parties in

23  an effort to resolve the dispute without court action."  Fed. R. Civ. P. 26(c)(1).  "A good faith

24  effort to confer requires a face-to-face meeting or a telephone conference."  Local Rule CR

1    26(c)(1).  Hartford did not include a certification that it conferred with PPG in a face-to-face

2    meeting or by telephone prior to bringing its motion.  Accordingly, the motion is DENIED.

3        4.  <u>Motion to Continue Trial and Related Dates</u>

4        Before the Court is Plaintiff's unopposed Motion to Continue Trial and Related Dates

5    (Dkt. # 43).  The trial is currently set for December 5, 2011, only slightly more than a month

6    away.  To allow the parties ample time to prepare for trial, the Court GRANTS Plaintiffs motion.

7    The parties are directed to confer regarding the amount of time necessary to complete discovery

8    and prepare for trial and submit a joint revised scheduling order to the Court within fourteen (14)

9    days of the date of this Order.

10                              **IV. CONCLUSION**

11        Having considered the parties' motions, the responses and replies thereto, all declarations

12    and attached exhibits, and the remainder of the record, the Court hereby finds and ORDERS:

13        (1)  Defendant's Motion for Summary Judgment (Dkt. # 22) is GRANTED.  The motion

14             to strike contained therein is moot.

15        (2)  Plaintiff's Motion for Partial Summary Judgment (Dkt. # 37) is DENIED.

16        (3)  Defendant's Motion for Protective Order (Dkt. # 20) is DENIED.

17        (4)  Plaintiff's Motion to Continue Trial and Related Dates (Dkt. # 43) is GRANTED.

18

19        Dated this 4th day of November 2011.

20

21

22        RICARDO S. MARTINEZ
           UNITED STATES DISTRICT JUDGE

23

24